```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
      ------------------------------------------------------------
 3                                    )
      Biomedical Device               )   File No. 17-CV-3403
 4    Consultants & Laboratories      )            (DWF/SER)
      of Colorado, LLC,               )
 5                                    )
              Plaintiff,              )   St. Paul, Minnesota
 6                                    )   December 1, 2017
      vs.                             )   10:55 a.m.
 7                                    )
      TA Instruments-Waters, LLC,     )
 8                                    )
              Defendant.              )
 9    ------------------------------------------------------------
10

11

12

13            BEFORE THE HONORABLE DONOVAN W. FRANK
                UNITED STATES DISTRICT COURT JUDGE
14

15                     (MOTIONS HEARING)
16

17

18

19

20

21

22

23

24
          Proceedings recorded by mechanical stenography;
25    transcript produced by computer.
```

1     APPEARANCES

2        For the Plaintiff:          Dorsey & Whitney, LLP
                                      FORREST TAHDOOAHNIPPAH, ESQ.
3                                     Suite 1500
                                      50 South Sixth Street
4                                     Minneapolis, Minnesota 55402

5                                     Dorsey & Whitney, LLP
                                      GREGORY S. TAMKIN, ESQ.
6                                     Suite 400
                                      1400 Wewatta Street
7                                     Denver, Colorado 80202

8        For the Defendant:          Fredrikson & Byron
                                      KATHERINE J. RAHLIN, ESQ.
9                                     Suite 4000
                                      200 South Sixth Street
10                                    Minneapolis, Minnesota 55402

11                                    McCarter & English
                                      KIA L. FREEMAN, ESQ.
12                                    265 Franklin Street
                                      Boston, Massachusetts 02110

13
         Court Reporter:             LORI A. SIMPSON, RMR-CRR
14                                    Suite 146
                                      316 North Robert Street
15                                    St. Paul, Minnesota 55101

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2              **IN OPEN COURT**

3          THE COURT:  Before we begin and before I make a

4  couple of comments about the procedural status of the case,

5  why don't we have introductions of counsel first.  We can

6  start on my right, counsel's left, and then move over.

7          MR. TAHDOOAHNIPPAH:  Thank you, Your Honor.  I'm

8  Forrest Tahdooahnippah from Dorsey & Whitney here on behalf

9  of Biomedical Device Consultants & Laboratories of Colorado,

10 and with me from our Denver office is Greg Tamkin.

11 Mr. Tamkin will be arguing the motion today.

12         THE COURT:  Good morning.

13         MR. TAMKIN:  Good morning, Your Honor.

14         MS. RAHLIN:  Good morning, Your Honor.  I am

15 Katherine Rahlin of Fredrikson & Byron representing

16 TA Instruments-Waters, and with me is Kia Freeman of

17 McCarter & English in Boston and Ms. Freeman will be arguing

18 the motion.

19         THE COURT:  All right.  I'll make a couple of

20 comments.

21         First of all, I will represent to you that myself

22 and one of my lawyer law clerks, Ms. Converse, we have had a

23 chance to read your submissions.

24         And then secondly, we can discuss at the end of

25 the arguments today the status and any scheduling issues

1     with the preliminary injunction and the respective views of

2     each party so that I'm fully aware of where we're at.

3              And then because of that, and actually it's not

4     unique to this case or unique because it's a patent case,

5     we'll discuss at the end of the hearing whether or not --

6     and without suggesting I'll order it if there's objection

7     because I didn't come in thinking I'd be ordering it at the

8     end of the hearing.  I'll wait to hear back from counsel

9     unless people say, well, the time for talk is over, here's

10    where we're at, but we could make available a magistrate

11    judge and then I'll say what I meant by that.

12              If there was some interest either before I rule on

13    this motion or before there's any formal hearing on the

14    preliminary injunction and how those should be coordinated,

15    if there's some interest in sitting down with the magistrate

16    judge to discuss settlement or mediation of some or all of

17    the issues, we can make that happen probably as soon as

18    people want it.

19              And then I will say something that is unique to

20    this case, not because of the case, but because of a

21    circumstance with our magistrate judges without getting into

22    too much private information.  Because obviously the

23    assigned magistrate is Magistrate Judge Steve Rau and

24    because of some recent surgery that he's had, he's

25    temporarily, you know, not hearing some things, although,

1    for example, he was into work a couple days this week.

2            So we're in a situation where I could either --

3    and I have already discussed this with him and Magistrate

4    Judge Becky Thorson and maybe it's relevant or maybe it's

5    not, that she did nothing but patent work the last few years

6    she was practicing law.  I could make one or both available,

7    depending upon circumstances, for any discussions because --

8    and we're doing that not just because it's a patent case,

9    but because of the recent surgery of Judge Rau a number of

10   people are helping out on cases.  So I actually broached

11   this subject this week on this case to both.  So we can have

12   that short discussion at the end of the hearing.

13           Then we can -- two things, one semi-serious, one

14   probably not serious at all.  One does go to the -- could

15   potentially go to the merits.  We can discuss the fact is it

16   relevant that probably the smallest number of Rule 12

17   motions do come in patent cases, even pre and post

18   Iqbal-Twombly, and so we can discuss that.

19           Now, on maybe not such a serious note, but the

20   word seems to travel that I've been on senior status since

21   Halloween of last year.  One, I haven't reduced my caseload

22   and I have a number of judges wondering if I'm feeling okay

23   because I'm the first judge since Ed Devitt not to go off

24   the patent wheel.  I haven't not only not reduced my

25   caseload, but I have not gone off the patent wheel, which --

1    because of the larger patent caseload we have.

2          And to the extent it's relevant, I'm actually the

3    judge who brought back to Minnesota -- primarily the patent

4    practice bar here in Minnesota gets the credit, but I

5    brought back the Northern District of California patent

6    practice local rules because they just had started the

7    Institute of Technology at Berkeley classes, ten-day

8    classes, for new or federal judges on patent trademark and

9    copyright and I was the first one from this district to go

10   in 1999 out to Berkeley and then I got exposed to the rules.

11   Then obviously to the credit, really, of the lawyers here in

12   this district, they worked those over for a time and

13   eventually implemented the rules that exist today.

14          So more than enough said by me and we -- you know,

15   maybe a trend that's not unique to patent cases and I don't

16   know if any of you -- I'm certain some of your firms and you

17   individually have experienced this, but when I've taught or

18   spoke at a couple of national patent practice or trial

19   practice institutes around the country in the last couple of

20   years, the biggest complaint by lawyers have been that oral

21   argument had disappeared and it's just not unique to

22   patents.  Even though it's some very fine lawyers who --

23   fine jurists who have stopped oral argument not just on

24   patent cases, but that was one of the biggest complaints

25   that I heard.  And I had a couple lawyers who were

1     participating from here saying please tell the people in the

2     room that we haven't done that in Minnesota.  But, yeah,

3     that seems to be a trend in addition to sometimes, for lack

4     of a legal word, farming out Markman hearings and other such

5     things too.

6            With that, we can proceed with argument and then

7     at the end of that we'll have a short discussion on where

8     we're at and where each party thinks we should be going.  So

9     whenever you are ready, Counsel.

10           For those of you visiting here, you should enjoy.

11    We rarely get that 50 degree weather.

12           And that podium goes up and down.  There's a

13    little button on the front.  You can make it any height that

14    you want.

15           MS. FREEMAN:  Thank you, Your Honor.  It seems

16    like a good level for me.  Good morning, Your Honor.

17           THE COURT:  And you have to kind of move the mike

18    semi close to you because they're not the -- there's two

19    there and sometimes they get in your way.  You can move one

20    off to the side if you want.  But they're not the fancy

21    entertainment mikes, so if you back too far off -- and

22    they're the same as yours -- it's kind of hard for everybody

23    to hear.

24           MS. FREEMAN:  Okay.  I'll do my best to be loud

25    enough so that you can hear me.

```
 1              THE COURT:  We're good.

 2              MS. FREEMAN:  Thank you for noting the problem

 3      with the volume level.

 4              My name is Kia Freeman and I represent

 5      TA Instruments-Waters, which is the defendant in this case.

 6      TA Instruments-Waters is a company known for innovative

 7      cardiovascular test instruments.

 8              According to the plaintiff in this case, which I

 9      will refer to as BDC --

10              THE COURT:  Fair enough.

11              MS. FREEMAN:  -- TA Instruments, its parent and

12      its affiliates are assignees of at least 50 patents and

13      patent applications, many directed to medical device

14      testing.  That's in the complaint in paragraph 5.

15              THE COURT:  And sorry to interrupt to something

16      that admittedly is entirely irrelevant to the case today,

17      but it brought -- reading over the papers, even though it

18      has nothing whatsoever to do with this case, but I

19      thought of it again now when you used the phrase "medical

20      device."  I had all the Guidant and Boston Scientific

21      pacemaker/defibrillator cases as a national MDL case back in

22      the -- well, it started around 2004.  So the last time I

23      heard the word "medical device" used a lot -- and that, of

24      course, was not a patent case whatsoever, but it was --

25      that's kind of the last time that -- and obviously that has
```

1    little to do with this, but that's the last time I saw the

2    word "medical device" used so predominantly in briefing.

3              Anyway, sorry to interrupt you.

4              MS. FREEMAN:  Thank you, Your Honor.  It sounds

5    like you have a good background and we are lucky to have you

6    on this case.

7              THE COURT:  Well, we'll see what you think when

8    we're all done.

9         (Laughter)

10             MS. FREEMAN:  If you turn to Exhibit E, pages 4 to

11   5 of Exhibit E -- when I'm referring to pages of Exhibit E,

12   I'm referring to the original pages at the bottom on the

13   left-hand side.

14             THE COURT:  Okay.

15             MS. FREEMAN:  Exhibit E on pages 4 to 5

16   illustrates TA Instruments' innovative products.  Innovation

17   in cardiovascular test instruments dates back to 1997 for

18   TA Instruments and its predecessors.

19             A predecessor of TA Instruments patented an

20   accelerated stent test instrument in 1997.  That patent is

21   Exhibit 2 to the reply in this motion.  And the stent test

22   instruments have been for sale by TA Instruments or its

23   predecessors since 1997, and Exhibit 6 to the reply is a

24   stent tester user manual demonstrating that.

25             Most of TA Instruments' innovative products are

1    not heart valve test instruments.  Again I refer to

2    Exhibit E to the complaint on pages 4 to 5.

3         So briefly going through the products as they're

4    shown on pages 4 to 5 of Exhibit E, you have the first

5    product on the left of page 4 of Exhibit E is a planar

6    biaxial TestBench instrument.  This product is used for

7    biomaterial characterization.

8         The second product on page 4 is the DuraPulse

9    heart valve test instrument, which that's a really long

10   name, so I might call it for short here the DuraPulse HVT

11   instrument.

12        THE COURT:  And that's kind of how it's referred

13   to in different ways in the briefing too, so.

14        MS. FREEMAN:  Yes.  The third instrument on page 4

15   of Exhibit E is the DuraPulse stent/graft test instrument

16   and this also may be referred to for short as the DuraPulse

17   SGT instrument.  The DuraPulse SGT instrument is a stent

18   test instrument.  It does not test heart valves.

19        The fourth product on page 4 of Exhibit E is a

20   multi-specimen fixture.  This tests substructures, such as

21   combinations of materials.

22        Turning to page 5 of Exhibit E, this is full of

23   different stent test instruments.  None of these are heart

24   valve test instruments.  The first product on the left

25   stretches stents axially and flows fluid through them.  The

1    middle product on page 5 stretches stents radially and

2    cycles them pulsatively.  The fourth product on page 5 of

3    Exhibit E pulses stents at high frequencies while bending

4    and stretching them in other directions.  So that is the

5    ElectroForce line of cardiovascular test instruments and,

6    again, importantly, most of them are not heart valve test

7    instruments.

8            THE COURT:  And I don't mean to interrupt and you

9    are probably going to address this, but obviously one of the

10   themes, separate from some of the descriptive phrases of

11   legal conclusions masquerading, I think the phrase is, as

12   factual allegations, separate from that kind of separate

13   argument that's been made, I think there's a theme and,

14   again, if you are going to get to it, I'll just sit tight,

15   but I was thinking of it as you went through these products

16   where you're saying, well, look it, the truth is there's

17   been no identification of which accused products, separate

18   from the issues of direct infringement on the claims,

19   whether it's claim 10 or the others.

20           So as you listed down all these products, you're

21   probably -- because I think one of your arguments is they

22   haven't adequately pled, well, which specific -- what are

23   the accused products.  I guess that's probably where you're

24   headed.

25           MS. FREEMAN:  That's absolutely right, Your Honor.

1    They do not define the accused products.  Let me just turn

2    to --

3             THE COURT:  And you don't have to change your

4    argument.  I didn't mean to interrupt.

5             MS. FREEMAN:  No, I'm happy to address that.

6    There is a section of the complaint that follows the heading

7    Defendant's Infringing Products that begins on paragraph 12

8    and goes through paragraph 16.  And paragraph 12 starts out

9    by saying, "Defendant makes, sells, and offers to sell the

10   ElectroForce line of cardiovascular test instruments."

11            If you then skip ahead to the first cause of

12   action in the complaint, which begins on paragraph 17 but is

13   really put out on paragraph 20, the infringement allegation

14   is addressed to, quote, infringing products.

15            If you go to the second cause of action, which is

16   the first indirect infringement cause of action, on

17   paragraph 26 it alleges that infringement by, quote, its

18   products, end quote.

19            So the infringement contentions do provide, they

20   refer to an example, but no place in the complaint is there

21   a limitation of the accused products unless you possibly

22   could infer one to the ElectroForce line of cardiovascular

23   test products based on the section heading Defendant's

24   Infringing Products and their introduction thereafter.

25            BDC admits its asserted patents are directed to

1    methods and devices for heart valve testing.  I refer Your

2    Honor to paragraph 11 of the complaint.  So let's infer for

3    now an implicit -- just for purposes of argument an implicit

4    limitation of the accused products --

5              THE COURT:  All right.

6              MS. FREEMAN:  -- to the ElectroForce line of

7    cardiovascular test instruments.

8              The ElectroForce mark was registered in 2002 based

9    on a first use at least in 2000.  I refer Your Honor to

10   Exhibit 5 to the reply.  In contrast, each of the four

11   asserted patents claim priority to 2009.  You can look at,

12   of course, the patents for that.  So the ElectroForce line

13   of cardiovascular test products were available nine years

14   before the priority claim of the asserted patents.  So

15   TA Instruments asks the Court not to hear BDC's suggestion

16   that TA Instruments' innovative products that predate the

17   asserted patents infringe the asserted patents.

18             Your Honor, there's no dispute that the

19   Twombly-Iqbal standard applies here.  Under Twombly-Iqbal,

20   pleadings are not necessarily entitled to the assumption of

21   truth.  That's in Iqbal at page 680 and there the Supreme

22   Court begins its analysis by identifying allegations that

23   are entitled to the assumption of truth.  There would be no

24   reason to do that if all allegations were entitled to the

25   assumption of truth.

1            THE COURT:  Well, and not to suggest it's the same

2       issue, but something not unique to patent cases but

3       consistent with kind of what you're saying is how that's

4       often asserted and it's in the air here in this case, you

5       know, one of the things that are entitled to whether we call

6       it a plausible or reasonable inference or assume it to be

7       true and then here comes the phrase we see a lot, sometimes

8       rightly characterized, sometimes not so rightly

9       characterized, bald assertions or bald conclusions asserted

10      and that if -- in other words, if a judge says, well, that

11      really isn't a factual allegation, it's baldly asserted,

12      that seems to be a phrase people like to use, legal

13      conclusion -- and, of course, obviously the two of you

14      disagree quite significantly today in how you describe the

15      complaint.  But, yes, there are certain -- that's an issue

16      in almost every Rule 12 case.

17           MS. FREEMAN:  I think what Your Honor is referring

18      to is a statement -- among others, one of the statements in

19      Iqbal that the court is not bound to accept as true legal

20      conclusions couched as factual allegation.

21           Instead the Twombly-Iqbal standard requires the

22      complaint to plead facts and Twombly says in footnote 3 at

23      page 555 without factual allegation, and this might not be

24      an exact quote, without factual allegation in the complaint,

25      it's hard to see how a claimant could satisfy the

1      requirement of fair notice of the nature of the claims, but

2      also the grounds on which claims rest.

3                  THE COURT:  Well, again, I keep saying I'm not

4      going to interrupt you, but I think you'd probably all agree

5      to another thing and I'm not so sure this wasn't -- a lot of

6      us feel this was the law before, what I am about to say,

7      before Iqbal-Twombly and in this case you probably both

8      aren't going to -- you probably are both going to agree with

9      this.  You're just going to disagree on describing the

10     complaint.  In other words, do the factual allegations give

11     rise to -- well, nowadays the word "plausible inference" is

12     used more than "reasonable inference," I guess, but they're

13     pretty much tantamount to one another.  And here, of course,

14     I think you've got plaintiff's counsel saying there are

15     plausible and reasonable inferences and you're saying, oh,

16     no, there's not.  In fact, you've raised -- you

17     significantly focus in on that in the reply brief.  So

18     that's kind of where -- and I know I interrupted you, but

19     that's kind of where the two of you part company.  So

20     obviously I'm going to have to say yes or no to that.

21                 MS. FREEMAN:  That's correct, Your Honor.  Twombly

22     at page 555 explains that the obligation to provide grounds

23     of entitlement to relief requires more than labels and

24     conclusions.

25                 THE COURT:  True.

1          MS. FREEMAN:  Thank you, Your Honor.  It also

2    says, "...formulaic recitation of the elements of a cause of

3    action will not do," and Iqbal says something very similar

4    on page 678.

5          Finally, this is another thing that Your Honor has

6    already mentioned, obviously familiar with it, Iqbal at 678

7    explains that naked assertions devoid of factual enhancement

8    do not suffice.

9      (Coughing)

10         MS. FREEMAN:  Excuse me, Your Honor.

11         THE COURT:  If you need to get some water or

12   something, feel free.

13         MS. FREEMAN:  I'm okay for now, but thank you for

14   offering.

15         THE COURT:  All right.

16         MS. FREEMAN:  So TA Instruments believes and

17   explains in its motion to dismiss that most of BDC's

18   allegations with respect to any of the asserted claims

19   amount to naked assertions devoid of factual enhancement and

20   therefore the pleadings with respect to the claim elements

21   do not suffice.

22         As Your Honor well knows, infringement requires an

23   accused product or process to satisfy every limitation of at

24   least one patent claim.  The Federal Circuit has explained

25   the failure to meet a single limitation is sufficient to

1    negate infringement of a claim.  That's <u>Laitram</u> from 1999.

2         Courts applying the <u>Twombly</u>-<u>Iqbal</u> standard to

3    patent infringement claims have required plaintiffs to set

4    forth sufficient facts to plausibly allege that the accused

5    product embodies every limitation in a particular asserted

6    claim.  That's a quote from <u>Oil-Dri</u>, but in the opening

7    brief on this motion on page 5 we identify eight cases in

8    support of that position.

9         Failure to plead accused products or a process

10   that meet all the limitations of at least one patent claim

11   is a valid reason for dismissal at the pleading stage and

12   for support for that Your Honor can refer to <u>Lyda v. CBS</u>,

13   which is a 2016 Federal Circuit case in which dismissal was

14   affirmed because there were no allegations that could form

15   the basis of a reasonable inference that each claim step was

16   performed.  On pages 8 through 9 of the reply brief we cite

17   a bunch of other cases for that.

18        In its opposition BDC doesn't really seem to

19   dispute that it has failed to put forward sufficient facts

20   to show that every limitation of at least one claim of each

21   patent is met by the accused exemplary product.

22        Instead they seem to rely on case law and in

23   particular BDC suggests that a lower standard applies based

24   on a few exceptional cases where secrecy was a problem.

25   Those cases are <u>Windy City</u>, <u>InCom</u>, and <u>Gracenote</u>.  Those are

1      all district court cases.

2            All of those three cases were cases involving

3      software or software products and software presents a

4      difficult situation where you pretty much have a black box

5      to the outside world, so it's hard to relate what's going on

6      in the black box to a patent claim.

7            Here the ElectroForce DuraPulse heart valve test

8      instrument is the opposite of a black box.  Again referring

9      to Exhibit E, at page 22 the DuraPulse heart valve test

10     instrument is described as having transparent, quick-open

11     chambers that provide visibility from all vantage points.

12     So that is literally the opposite of a black box.

13           Moreover, secrecy is not a challenge for BDC here

14     and that is obvious from the complaint itself.  BDC has been

15     aware of the DuraPulse heart valve test instrument since

16     July 2014.  You can refer to the complaint at paragraph 16

17     for that.  BDC alleges that infringement began in December

18     2015.  That's at paragraph 20 of the complaint.  So based on

19     that information, we must understand that BDC was aware of

20     the DuraPulse heart valve test instrument for at least a

21     year and a half before it was offered for sale.

22           In February 2016 BDC wrote TA Instruments

23     regarding infringement by the DuraPulse heart valve test

24     instrument and provided the numbers of the asserted patents.

25     That's in the complaint at paragraph 16.

1              THE COURT:  Right.

2              MS. FREEMAN:  BDC also contends that

3     TA Instruments has been advertising the DuraPulse heart

4     valve test instrument since at least December 2015.  That's

5     in the complaint at paragraph 14.  And BDC cites the

6     advertisements as the basis for its allegations.  You can

7     see that, for example, in paragraphs 12 and 15 of the

8     complaint.

9              So there is no reasonable basis for BDC to apply

10    case law which deals with an exceptional circumstance where

11    secrecy is a problem for the plaintiff trying to satisfy the

12    pleading standard.  In fact, BDC has no problems with regard

13    to secrecy.  They are able to get everything they need.  In

14    fact, they have argued that.

15             So if we turn to the reply brief in which BDC has

16    quoted its -- sorry.  They have quoted their assertions with

17    respect to each of the patents and if you look at their

18    assertions, again, quoted in the opposition on page --

19    beginning on page 8 and going through page 9, and you

20    compare them to the patents, you can see that there's almost

21    nothing that they allege with regard to the asserted claims

22    that goes beyond the actual language of the asserted claims.

23    In fact, they don't even necessarily cover all of -- the

24    entirety of the language of the asserted claims.

25             So let's look, for example, at the '538 Patent.

1    They assert independent claims 1 and 6.  Let's start with 1.

2    So 1 is a test system -- I'm just reading claim 1 of the

3    '538 Patent -- is a test system for simultaneous accelerated

4    cyclic testing of one or more valved prosthetic devices

5    comprising a test chamber, a signal generator that outputs a

6    non-regular waveform over a cycle for controlling a rate of

7    change of a differential pressure load across the one or

8    more valved prosthetic devices during a cycle.  Let's just

9    stop there and turn to the allegations with regard to that

10   claim.

11          So, for example, BDC says in paragraph 22 of the

12   complaint, "The DuraPulse is a system for performing

13   accelerated testing of valved prosthetic devices.  It has a

14   test chamber."  That so far seems to be a repetition of the

15   claim language, just putting "the DuraPulse" at the

16   beginning of the claim language.  That is a legal conclusion

17   without any facts to support it.  It's just a legal

18   conclusion masquerading as a factual allegation.

19          But let's turn to the third sentence.  It says,

20   "It generates a non-regular waveform used to test a

21   prosthetic heart valve."  Okay.  So by "it" presumably they

22   mean the DuraPulse.  They're not particularly clear.

23          Plus it says, "It generates a non-regular

24   waveform" and the claim requires a signal generator that

25   outputs a non-regular waveform.  BDC does not provide any

1    notice of what it may consider to be a signal generator.

2    Presumably they should have a good-faith belief that

3    DuraPulse has a signal generator, but it does not provide

4    any fair notice of the grounds for its belief that DuraPulse

5    has a signal generator or what it means by signal generator

6    with respect to the DuraPulse.

7          Additionally, moving on to -- hold on just a

8    minute.

9       (Pause)

10          MS. FREEMAN:  BDC also asserts claim 10 of the

11   '538 Patent and claim 10 requires -- this is about the

12   third -- this is in the second step.  Claim 10 is a method.

13   Claim 10 requires driving a motor acyclically.  BDC does not

14   even assert that the DuraPulse heart valve test instrument

15   drives a motor acyclically.  So TA Instruments has no

16   notice, if even BDC believes that to be true, nor do we know

17   what BDC might mean by that.

18          Looking at the first step of claim 10, it requires

19   generating an asymmetric waveform.  If you look at Exhibit E

20   to the complaint, on page 10 Exhibit E says purely symmetric

21   pulsation is provided by ElectroForce motors.  That seems to

22   directly contradict assertions related to claim 10 of the

23   '538 Patent.

24          Turning to the '708 Patent, the '708 Patent is

25   directed to a test chamber for accelerated cyclic testing of

1    a valved prosthetic device in a variable pressurized

2    environment.  It comprises -- and I am just going by the

3    claim 17 language.  BDC has asserted claim 17.  Claim 17

4    requires a fluid distribution chamber having a first

5    manifold defining a first port configured to receive and

6    fluidicly couple with a first end of a sample holder and a

7    lower face defining an aperture for communicating with a

8    fluid pressure source.  And then it also requires a fluid

9    return chamber -- sorry, a fluid return conduit both

10   structurally and fluidicly connected to the fluid

11   distribution chamber.

12          So if you read through BDC's allegations with

13   respect to claim 17, first of all, it very, very closely

14   follows and mostly is using exactly the language of

15   claim 17.  However, if you look at it carefully, I do not

16   see honestly -- I may have missed this, I keep looking and

17   looking, but I do not see any reference to a fluid return

18   conduit.  I'm looking, like, for the 17th time.  I just

19   don't see any mention of a fluid return conduit.

20          Plus, the way BDC presents its allegations, it

21   says, and I quote, "It has a fluid distribution chamber."

22   The claims obviously require a fluid distribution chamber.

23   A statement that it has a fluid distribution chamber is

24   clearly a bald legal conclusion that is offered to -- that

25   is not entitled to the assumption of truth and should be

1    disregarded.

2              Turning now to the next patent, Patent '224, it

3    has one independent claim.  That is the asserted independent

4    claim.  So here again the allegations almost -- they do

5    refer to a particular range of rates and TA Instruments

6    concedes that is a factual allegation.  However, the rest of

7    it is really just a bald legal conclusion unadorned by

8    factual assertions.

9              Moreover, claim 1 of the '224 Patent requires

10   driving a test system fluid cyclically.  I don't think they

11   even mention that word.  Possibly they hope the Court will

12   infer that that is somehow met by its bald legal

13   conclusions.  I don't know how.

14             But I note that claim 10 of the '538 Patent

15   requires driving a motor acyclically.  So to the extent one

16   were inclined to infer that something were cyclic, one

17   couldn't also plausibly infer that it was also acyclic.

18             Turning now to -- let me just clarify a little

19   bit.  BDC bases all of its exemplary allegations to the

20   DuraPulse, which it defines as the DuraPulse heart valve

21   test.  We presume they're referring to the ElectroForce

22   DuraPulse heart valve test instrument and that is used as

23   the single example that it applies for each of the different

24   patents.  So to the extent that an inference were made for

25   one, the opposite inference couldn't also plausibly at the

1    same time be true of the same instrument.

2         Turning now to the '935 Patent, a similar

3    situation exists.  You have -- hold on just a moment.

4       (Pause)

5         MS. FREEMAN:  The first element of the '935,

6    claim 1, patent claim 1, requires a pressure source

7    configured to drive a test system fluid cyclically.  There

8    is no allegation that I see in BDC's assertions regarding

9    the '935 patent claims that anything is done cyclically.

10        If you look at the remainder of the allegations,

11   with the exception of the range of rates, which we agree is

12   a factual allegation, almost everything is just a bare legal

13   conclusion unadorned by a factual assertion and for that

14   reason, Your Honor, we ask you to dismiss the complaint.

15        THE COURT:  All right.  There will be time for --

16   sometimes a judge selfishly likes some rebuttal and

17   surrebuttal, depending on where in this case plaintiff --

18   one question for you before I have plaintiff's counsel come

19   up and, again, it's not unique to -- and maybe one or more

20   of you will say, well, there's some things that should be

21   unique to this motion in a patent case, but one question

22   that comes up in almost every Rule 12 scenario is, well,

23   let's just say, for example, whether the Court -- if the

24   Court is going to be granting in whole or in part your

25   motion, I think I know what you are going to say, but

1    obviously there's issues of with or without prejudice with

2    leave to amend.  Do you wish to give me your view on that?

3              MS. FREEMAN:  Our position is that prejudice would

4    be premature.

5              THE COURT:  All right.  Thank you.  I'll hear from

6    plaintiff's counsel.

7              MS. FREEMAN:  Thank you, Your Honor.

8              THE COURT:  Thank you.  There will be time for

9    rebuttal.

10             Are you disappointed that there's no snow on the

11   ground up here?

12             MR. TAMKIN:  I am not disappointed that there's no

13   snow on the ground.  I'm from Denver, Colorado.  In Denver,

14   Colorado, we also don't have snow on the ground, but we hope

15   to have it in the mountains this coming weekend.

16             THE COURT:  Yes.

17             MR. TAMKIN:  Like you, we have been unusually warm

18   and so we just don't have the amount of snow, but I have a

19   feeling -- it's December 1st -- it will come.

20             THE COURT:  And I think you're the first one in

21   the room to say the word "December" today too.

22             MR. TAMKIN:  If I may have just a moment, Your

23   Honor?

24        (Pause)

25             MR. TAMKIN:  Good morning again, Your Honor.

1              THE COURT:  Good morning.

2              MR. TAMKIN:  My name is Greg Tamkin.  I represent

3      the plaintiff in this case, BDC Labs, which I will refer to

4      either as BDC or BDC Labs from time to time.

5              THE COURT:  Fair enough.

6              MR. TAMKIN:  I want to be brief because what I've

7      heard for the most part this morning is an argument that one

8      often hears when there is a challenge to the sufficiency of

9      one's disclosures under the local rules or sometimes an

10     argument that one hears on a motion for summary judgment

11     concerning infringement, has there been proof of this

12     element or that element, is the proof sufficient, is there

13     enough of an allegation, a tie between what's out there on

14     the market and what is in the documents that have been

15     submitted.

16              Taking a step back, Your Honor, this is a

17     complaint.  This is a complaint and under Iqbal and Twombly

18     it's supposed to provide a plausible basis for a claim.

19     There's no question this complaint does that.  This is not a

20     Form 18 complaint that was abandoned in 2015.  This is a

21     complaint with detailed factual allegations.  Frankly, often

22     in my patent complaints I don't include a citation to

23     evidence that supports exactly where the factual allegation

24     came from, but these are factual allegations.

25              And the argument that I'm hearing is what is the

1    difference, what is a factual allegation versus a legal

2    conclusion.  A legal conclusion is you infringe.  A legal

3    conclusion is you breached a duty.  A legal conclusion is

4    you breached the contract.

5          Here there are facts set forth and what the

6    defense counsel is stating is that the way the facts are set

7    forth, because they use language in the patent, that somehow

8    turns it into a legal conclusion.

9          And in this case the patent is somewhat

10   complicated.  It involves waveforms and signal generators

11   and things of that nature.  Let's take a patent that --

12   theoretically a patent that I would write on the coffee urn

13   in front of you.

14          THE COURT:  All right.

15          MR. TAMKIN:  It would be an urn that has the

16   following elements: a handle, a plastic lid, a metal body,

17   and let's assume a heating element.  Okay?  Those would be

18   four things.

19          How would I describe the fact that that patent

20   that describes the product, the unique invention, how would

21   I describe that your urn in front of you, your coffee pot or

22   water jug in front of you infringes?  I would say it has a

23   handle.  That's not a legal conclusion.  I've just used the

24   language in my claim.  I would say it has a plastic lid

25   because I can see it's a plastic lid.  I would say it has a

1    metal body because I can see that it's a metal body.  I

2    wouldn't describe in any more detail than that.  And that's

3    what's been done in this particular case.

4         If you look at it and you look at the claims --

5    and I'll just take two of them because I don't think it

6    really matters.  I'm going to start with paragraph 22 of the

7    complaint because it refers to '538.

8         THE COURT:  Okay.

9         MR. TAMKIN:  Well, paragraph 22 I went through and

10   said what factual allegations are in that paragraph 22 and I

11   just did this this morning.  I wrote them down.  Well, the

12   first factual allegation is that this product performs

13   accelerated testing.  Next factual allegation, the product,

14   looking at it, has a test chamber.  Next factual allegation,

15   the product generates a non-regular waveform for testing a

16   device.  Next fact is there is a drive motor that has been

17   alleged.  Next fact is there's a fluid displacement member.

18   Next fact is it is driven based on a non-regular waveform,

19   which, by the way, is software.  We'll get there in a few

20   minutes.  But the point is those are all very specific,

21   broken-down, small facts.

22        I'll do the same thing just to skip to, say, the

23   '935 patent because it's a pretty different patent than the

24   first -- the first two and the second two are sort of

25   different --

1          THE COURT:  Right.

2          MR. TAMKIN:  -- go to really different things, but

3     those two are -- those four, they are two sort of pairs, if

4     you will.

5          And so I looked at paragraph 54 and paragraph 54,

6     again I went and looked at what are the factual allegations.

7     This device performs accelerated testing of valved

8     prosthetic devices, heart valves, for example.  There's a

9     pressure source.  It drives above the normal range of a

10    heartbeat.  In fact, as counsel said, it drives between --

11    it can drive between 900 beats per minute and I think it's

12    twice that or 1,800 beats per minute.  There's a

13    pressurizable chamber.  You can look at the documents and

14    there's a pressurizable chamber.  There's fluid in the

15    chamber.  You can look at the video that we cited and see in

16    that video it shows there's fluid and stated that's a fact.

17    There are two sides of that device.  You can see that and

18    that's been stated in the claim.  They are in fluid

19    communication.  Obviously there has to be a way that they're

20    in communication, which is fluid communication with the

21    pressure source.  There has to be a way for there to be two

22    sides of the device that would be in fluid communication.

23    There's also what's called an excess volume area for storing

24    fluid when compressed and there is -- you can look at the

25    product and you can say, oh, look, there's an area where

1    there's not fluid, an excess volume area.  It's not all the

2    way full.  And when you see it's driven, that would be

3    compressed.  You can see it when it actually happens.

4            Those are facts.  You're looking at something and

5    you're describing it.  Just like when I described your urn,

6    I can see it's metal, I can see it's plastic on the top, I

7    can tap it and see that it's plastic on the top.  That's a

8    fact.  That's not a legal conclusion.  A legal conclusion is

9    there is infringement or there is contributory infringement

10   or there is inducement of infringement, things of that

11   nature.

12           THE COURT:  Now, it may not be related to what you

13   just said, but obviously you heard counsel state and I had

14   asked a question that was extensively briefed and I'm quite

15   certain I know what you are going to say, but they say, not

16   only in your pleadings, but to actually apply it to the

17   written submissions as well, they say we have no idea which

18   product or products actually is accused of infringing.

19           MR. TAMKIN:  Sure.  It's hard to believe that

20   that's actually a fair statement.  The complaint

21   specifically describes the DuraPulse throughout and the

22   DuraPulse is defined, I want to say, in paragraph 5.  Let me

23   see if I can find it here in my notes.  But the DuraPulse is

24   specifically -- I'm sorry, it's in paragraph 13 -- is

25   specifically defined as a DuraPulse heart valve test

1      instrument.  This is about the DuraPulse heart valve test

2      instrument.  There's no question in here.  All of the

3      examples, all of the documents that we're referencing are

4      that.  It relates to -- as counsel even indicated, it

5      relates to testing of heart valve devices.

6              THE COURT:  I think they're saying, well, are

7      the plaintiff's -- I think their question was are the

8      plaintiff's, I'll use their phrase, instrumentalities

9      limited to the, and I think I can read my writing, the

10     ElectroForce DuraPulse heart valve test instrument.

11             MR. TAMKIN:  I think so.  I think that's what it

12     says.  The problem is that we don't know, Your Honor, is I

13     don't know when I'm drafting a complaint how the defendants

14     describe their products.  I don't know the secret name they

15     use.  And that's what the court, Judge Rogers, talked about

16     in the Windy City case.  We don't know exactly how the other

17     side is or one side is going to describe their products.

18     And there they described Skype and they described a few

19     other of these software products and did them very

20     generally, and at the initial stage the court found that was

21     fine.  You can describe them in general because there was

22     some evidence about what those products were doing.  It's

23     the products that do that.

24             And here the plaintiff is not charged with knowing

25     the precise nomenclature of the defendant.  I mean,

1    obviously we're up here talking about the ElectroForce that

2    apparently was invented or coined -- the term is "coined" --

3    in 2002.  I don't think that anybody really thinks that if

4    we're dealing with a patent that takes priority in 2009

5    we're accusing something from 2002 of infringement.  We

6    wouldn't be here.  Nobody -- everybody recognizes that.

7              So I think it is disingenuous or a stretch, at

8    least, for the defense to claim they don't know what this

9    case is about.  Are they on notice of what product we're

10   talking about?  There's four different patents at issue.

11   Each of those claims -- more than that many claims, but each

12   of the claims goes through and talks about the DuraPulse

13   heart test value instrument.

14             Now, I think as best I can characterize it, that

15   if we would have left out paragraph -- if we would have

16   reordered the first paragraph that talks about in general

17   and kept in the second paragraph that talk about the product

18   specifics and put that more general statement at the end,

19   then it might not have been as confusing.  I'm not really

20   sure that's the appropriate way to read a complaint.

21             So getting back to sort of the bottom line of the

22   issue is there are extensive factual allegations.  Not only

23   are there extensive factual allegations, but those factual

24   allegations are not just bald-faced, made-up.

25             Now, frankly, I don't think there is a requirement

1    whatsoever that the plaintiff would have had to cite to

2    where its support is for the fact that it's making.  I don't

3    think there's a requirement that you attach that.  I don't

4    think there's a requirement that you cite to it.

5           That being said, there's a myriad of cites

6    throughout and there's cites to, number one, that Exhibit E

7    to the complaint and, number two, there's cites to a

8    specific brochure.  That brochure, I apologize, was not

9    attached to the complaint, but is certainly referenced in

10   the complaint and certainly was provided.

11          But to the extent that there's any question about

12   the notice, certainly those documents that are referenced

13   would be something that can be included and specifically

14   there's specific references to what is at issue.

15          But turning to the law and what needs to be done

16   in this case, you need to state factual allegations.  You

17   need to state that there is a patent, that the patent has

18   been infringed, and how -- what the accused instrumentality

19   is or accused device is and the functions and the ways that

20   it's infringing.  All of that is done through factual

21   statements about what that device has.

22          Now, I mentioned earlier that the device in

23   question has a number of elements.  It's not as simple as my

24   coffee urn example.  It has both software and it has

25   hardware.

1           And certainly there are transparent portions, it's

2     a glass or plastic box that you can see in, but there's also

3     you're driving a waveform and there's a motor in there and

4     it drives based on a signal and that signal is represented

5     and described in those materials and that's what is actually

6     cited, but those -- and we'll get here some other day, but

7     an expert has looked at that and made various different

8     statements.

9           Just as an aside, it's interesting that we're

10    here and I know that this is premature, but obviously

11    there's been a lot of work done.  There was a motion for a

12    preliminary injunction filed.  There is an expert affidavit.

13    It would -- ultimately what we would be doing is -- I ask:

14    What happens if the Court does grant the motion and grants

15    it without prejudice to re-amend?  What would I do?  Would I

16    then simply submit the expert declaration and affidavit and

17    say, well, here's -- are these different facts?

18          Certainly the expert is going to describe many of

19    the things the same way.  The expert is going to say about

20    the coffee cup -- or coffee urn there's a handle.  The

21    expert is going to say that here there's a fluid chamber or

22    there's an excess volume chamber.  That's something that the

23    expert is going to see, but those are facts and they're not

24    legal conclusions.

25          But in any event, with respect to the application

1   of those cases, first, the cases that are cited, they are

2   district court cases, I agree, but they are well-respected

3   district court cases.  I think everybody agrees that the

4   <u>Windy City</u> case is authority.  It's cited around the

5   country, Judge Rogers' opinion.

6              THE COURT:  Some of these are Rule 12 motions.

7   Some of them, the cases that you have each cited, are

8   summary judgment decisions too.

9              MR. TAMKIN:  I think for the most part we've tried

10  to cite Rule 12 decisions.

11             THE COURT:  Right, but that's -- it's not the

12  first Rule 12 motion where obviously a variety of cases on

13  similar issues are discussed because that becomes an issue

14  of, well, yes, these are maybe legitimate issues, but it

15  should be done at the Rule 56 stage, not the Rule 12 stage,

16  and the list goes on.

17             MR. TAMKIN:  Correct.  And we certainly think that

18  if there's an issue with whether or not we have proven that

19  there is a conduit or something like that, that's for a

20  different day.

21             But if you look at the allegations in the <u>Windy</u>

22  <u>City</u> case or some of the other cases we cited, those

23  allegations are very broad.  They do the best that the

24  plaintiff can.  Here I think we've done a lot more than

25  that.

1    But I also think to the extent that counsel

2    indicates that the Windy City case is about software, this

3    is about software too.  Certainly it's a box, certainly

4    there are things in the box, there's chambers, but there's

5    also a waveform and driving that waveform and there is some

6    software involved.

7    But in any event, the Windy City case requires

8    that you describe the product, you identify the product.

9    The DuraPulse is described -- or the DuraPulse heart valve

10   test product is described and there's details about exactly

11   how it infringes.

12   Because we use language that is similar to the

13   language in the patent, that doesn't mean it is a legal

14   conclusion.  I think -- it would be interesting because

15   imagine, Your Honor, if instead of using language that is in

16   the patent we tried to describe it in ways that wasn't the

17   language in the patent.  Then I presume I would be here

18   trying to defend against the fact that I haven't really

19   connected up the patents-at-issue with my description of the

20   product.  So one way or the other I'm stuck.

21   So I think the standard of the Windy City case is

22   met, but I also want to refer to one other thing in the

23   Windy City case that is also raised in I think it's the

24   Telebrands case that's cited in the brief, which is a

25   District of New Jersey case that's noting that Windy City

1    and InCom are cases important to follow.  That's a District

2    of New Jersey case.  It's a Lexis cite, but 2016 Lexis

3    114436 at 14 and 15.

4         In that case it notes that there is this interplay

5    between the local rules that Your Honor addressed early on

6    versus the complaint.  And the local rules don't in any way,

7    shape, or form change the pleading requirements, I agree,

8    but the local rules inform, in all these districts all over

9    the country now, inform us on how those pleading

10   requirements are interpreted.

11        And what the Telebrands case specifically said is,

12   just like Judge Rogers in the Windy City case indicated,

13   that the appropriate time for the detailed allegations and

14   the citations and the heightened standard is in the local

15   rules, it's not here, and we're informed by the local rules

16   that require a much more detailed set of allegations once

17   you do your infringement contentions.

18        THE COURT:  Claim charts, for example.

19        MR. TAMKIN:  Claim charts, exactly.  This,

20   frankly, is pretty close to a claim chart, but I would say

21   it's not exactly a claim chart by any stretch.  It doesn't

22   have pictures or things like that.

23        But certainly there's a time for claim charts and

24   the time for claim charts is not here.  Here what we have

25   done is we have set forth the details and described the

1    product itself.

2              Absolutely we've used the language of the patent,

3    but there's nothing wrong with using the language of the

4    patent.  Using the language of the patent doesn't mean it's

5    a legal conclusion.  Patents use descriptive language and

6    state facts.  If it says it has to have a chamber, what

7    would I say other than it has a chamber?  It doesn't make it

8    a legal conclusion just because the language is in the

9    patent.

10             But getting back to my point on the claim charts,

11   this is not a time for claim charts.  This is not a

12   question of the sufficiency of the defendant's claim chart

13   at all.

14             And so the only other question is the one I think

15   Your Honor raised that we've addressed, which is is there a

16   product that is known here, is there disclosure, is there

17   notice in this complaint.

18             THE COURT:  Well, not to interrupt you, but then

19   of course a phrase, and it was addressed today by opposing

20   counsel, but a phrase that is said a number of different

21   ways saying, well, plaintiff must have set forth -- alleged

22   that the accused product embodies every limitation in at

23   least one particular claim and they're saying that was not

24   done here.

25             MR. TAMKIN:  Well, first of all, that's not the

1     law.  That is -- of course we all agree that the law is in

2     order to infringe a claim, you have to satisfy all the

3     elements, but the law is not that you have to describe every

4     single claim.

5             But every element of a claim of each of these

6     patents was clearly set forth in the document.  So, for

7     example, you can take claim 1 of the '538 Patent.  Easy also

8     to take claim 9 -- excuse me, the claim cited of the '935

9     Patent.  But you can go look and compare, Your Honor.  There

10    are elements of every single one of those claims set forth.

11            Now, certainly there was some argument about some

12    things are done cyclically, some things are not done

13    cyclically when you do certain -- I think counsel even

14    argued that there was something that was a pure sinusoidal

15    waveform or something like that which would be cyclical, an

16    asymmetric wave would potentially -- or is acyclical.  You

17    don't have to repeat things that you have already said.  If

18    you've described an asymmetric waveform, is that going to be

19    acyclical?  Yes.  If you've described something as cyclical,

20    it's going to be something different.

21            These products are capable of doing multiple

22    different things, certainly, and being set different ways

23    and we've described that and we've shown the pictures and

24    we've identified the pictures of those various different

25    documents.  But certainly one of the elements of all of the

1    claims are -- all of the elements of one of the claims of

2    each of the patents is particularly described.

3            And, again, Your Honor, if we use all the words of

4    the patent -- we're criticized in this case for not using

5    all of the words in the patent, but at the same time we're

6    criticized if we do use the words of the patent.  So you

7    can't win.

8            But if you look at the InCom case, the InCom case

9    is pretty telling on that point too.  In that case the court

10   said they generally describe the functionality.  You don't

11   have to describe every element.  You have to describe the

12   functionality of the product and how that product operates,

13   and that's absolutely what we did.

14           So if you follow the InCom case -- in the InCom

15   case there was a novel patent.  This case is a novel patent.

16   There's some various different features and you have all

17   those features.  We've described those.  That functionality

18   of the product and how it infringes the patent is described

19   and that's really what has to be met there.

20           We were told that we have an hour and --

21           THE COURT:  We're fine.

22           MR. TAMKIN:  Oh, okay.

23           THE COURT:  Obviously I'm not going to turn off

24   the lights.  Take the time you need.

25           MR. TAMKIN:  I do hate to be the one that is

1    standing between everybody in the room and their lunch.

2         THE COURT:  Of course, what is well-known in this

3    building, and that's why sometimes I have to be vigilant for

4    lawyers and court reporters and all staff, is I know it's

5    not good for you, but I never eat lunch.  That's usually not

6    an incentive for me to shut the door down.

7         MR. TAMKIN:  Good to know for future reference,

8    Your Honor.  With that I will simply say this is -- again,

9    to summarize my argument, unless the Court has any further

10   questions, to summarize my argument, this is the pleading

11   stage.  Iqbal and Twombly require setting forth facts to

12   create a plausible case of infringement.  There's little

13   question here that there is a plausible case for

14   infringement.

15        The real question that I am left with is everybody

16   agrees that if the Court were to dismiss this, it would be a

17   dismissal without prejudice to allow an amendment.  What

18   would the amendment look like?  Would I state more things?

19   Would you want me to add more information about each of the

20   individual elements?  Likewise, would I state -- would I

21   provide an expert affidavit?  How much more do you need?  Do

22   I need to use different words to describe the same facts

23   because my words were too close to the patent?  That doesn't

24   seem to make a lot of sense here.

25        This is a case that should move forward and

1    there's no reason not to based on these allegations.  I know

2    we're slightly past this stage in terms of the current

3    jurisprudence, but there was a concept of notice pleading.

4    There is little question here that notice pleading is beyond

5    satisfied, but, in fact, it's beyond notice pleading.

6    There's a reasonable inference, to Your Honor's expression.

7    Clearly a plausible case for infringement has been made.

8    This is not a time when we need to set forth the

9    infringement contentions.  We will do that soon enough.

10   And, frankly, as the Court knows, at least for the patents

11   at issue in the preliminary injunction motion, which we'll

12   talk about shortly, the scheduling anyway, that's -- we're

13   well past that and I think everybody is on notice.  I think

14   it's time to get this case moving along and the motion

15   should be denied.

16        Thank you, Your Honor.

17        THE COURT:  I will likely give you the last word

18   after I hear some brief rebuttal from opposing counsel.

19        MR. TAMKIN:  Okay.  Thank you.

20        THE COURT:  That doesn't mean you're obligated to

21   give rebuttal, but I may have had one or two cases over the

22   years where people decline to give rebuttal, maybe one, but

23   I can't -- that's rare.

24        MS. FREEMAN:  Thank you, Your Honor.  I would like

25   to provide rebuttal.

1          Let's start with BDC's new allegation that

2     obviously their complaint is limited to the heart valve test

3     instrument.  Apparently they believe we should interpret

4     their complaint in a way that they believe is reasonable.  I

5     don't know how we should know what they think is reasonable

6     and they may not agree on what we believe is reasonable.  So

7     we think that they should say what they mean and not expect

8     us to provide some interpretation which they believe is

9     reasonable.

10          Let's talk about DuraPulse.  You specifically

11     asked them if the complaint is limited to the DuraPulse

12     heart valve test instrument and I think they said I think

13     so, maybe there's a secret name.  They still were not pinned

14     down, Your Honor.  They did not say, yes, it is.  So we

15     still don't know, even after hearing them, whether the

16     complaint is limited to the DuraPulse heart valve test

17     instrument.

18          In the complaint on paragraph 13 BDC says, "The

19     ElectroForce line includes products," which is a plural

20     word, "for performing accelerated testing of heart valve

21     devices, including the DuraPulse Heart Valve Test

22     ('DuraPulse')."

23          And then from there they provide -- let me turn

24     Your Honor's attention to paragraph 21 of the complaint.

25     Well, actually at 20 they talk about infringing products and

1     then on 21 they say, and I quote, "for example, and without

2     limitation, the DuraPulse."

3              So they expressly -- the complaint expressly is

4     not limited to the DuraPulse.  If BDC wants to limit their

5     complaint to the DuraPulse, they're obviously free to do so.

6     We can't write BDC's complaint for them.  We don't want to.

7     We just want them to be clear so that we know what the

8     accused products are.

9              In its oral argument BDC argued that there's no

10    question that they have provided detailed factual arguments.

11    There absolutely is a question, Your Honor.

12             THE COURT:  Obviously I'm going to have to agree

13    or disagree with one of you because you've each described

14    the complaint quite differently.

15             MS. FREEMAN:  Yes, Your Honor.

16             THE COURT:  That much we can agree on, I think.

17             MS. FREEMAN:  Even if you give them the benefit of

18    the doubt as to any software that's involved in the

19    DuraPulse heart valve test instrument, they still haven't

20    even come close to providing factual allegations as to the

21    transparent.  Most of the product is transparent and you can

22    highly -- it's made to be extremely visible and clear

23    exactly what's going on in the product.  And BDC just hasn't

24    even made any effort to explain what they're talking about

25    to give TA Instruments fair notice of the grounds.

1          Under TA -- sorry.  Under BDC's theory what they

2    could do is they could just choose a claim, choose a

3    product, let's say DuraPulse, even though DuraPulse is a

4    trademark, so we'll say the DuraPulse product, and they

5    could say "is" and they could recite just exactly a claim.

6    According to BDC, that is all that is required.  And that is

7    specifically rejected by the Supreme Court already.

8    "...formulaic recitation of the elements of a cause of

9    action will not do."  That is exactly what BDC is doing

10   here.

11         At most what they've done is they've broken up the

12   claim into a number of pieces and talked about most of the

13   pieces, not even all of the pieces in every case.  So

14   claim 1 requires a test chamber.  They say something like

15   DuraPulse has a test chamber.  That is nothing more than a

16   formulaic recitation of the cause of action and the Supreme

17   Court says that will not do.

18         So let me just go one step further into the

19   ridiculousness of BDC's position.  They're saying, well, we

20   can just -- actually under BDC's theory we have to use the

21   claim language, so we can just use that claim language and,

22   hey, we can include a reference to the Internet, so we've

23   got everything in the claim and we're just using that exact

24   language, so we're good and, hey, you know it's a fact

25   because we refer to the Internet.  That is absolutely not

1    sufficient for a pleading standard.  It doesn't provide

2    notice of the grounds that BDC is relying on as to what they

3    believe constitutes infringement.

4            They can see -- I think BDC has admitted that

5    they've actually seen the DuraPulse heart valve test

6    instrument in operation.  They don't suggest that there is

7    a deficiency in the publicly-available information on that,

8    on the product, and yet they believe that the Court

9    should go by cases in which there was a deficiency of

10   publicly-available information.

11           Again, the cases that BDC relies on are

12   exceptional cases.  Even if you give them the exception for

13   any software that's involved in the DuraPulse heart valve

14   test instrument, that would not apply to the completely

15   transparent and highly-visible portions of the device where

16   you can actually see what's going on in the product and it's

17   designed so you can clearly see from all different angles

18   what's going on in the product.  That has nothing to do with

19   software.  And as to those parts of the claims, BDC has said

20   nothing that is more than a simple recitation of claim

21   language.

22           Also, Your Honor, we would direct the Court to

23   Robern and e.Digital, which are the more favored, in our

24   view, cases.  Plus, this Court is bound by Supreme Court and

25   the Federal Circuit.  Other district court cases can be

1    interesting, they might be persuasive, but the Court is

2    bound by the Supreme Court and the Federal Circuit.

3              THE COURT:  Without a doubt.  Without a doubt even

4    though the Federal Circuit hasn't done so well with the

5    Supreme Court either in the last couple of years.  We have

6    about a 60 percent plus reversal rate of our Markman hearing

7    orders --

8              MS. FREEMAN:  Oh, no.

9              THE COURT:  -- the trial bench in the country,

10   with the circuit and I think the circuit's numbers are

11   actually over 80 percent reversal rate by the U.S. Supreme

12   Court, so.

13             MS. FREEMAN:  BDC talks about the local patent

14   rules.  That's fine.  Obviously we intend to comply with the

15   local patent rules, but the local patent rules really have

16   nothing to do with pleadings.  We're not talking about

17   infringement contentions.  We're not talking about proof.

18   We're talking about asserting facts that give rise to a

19   plausible inference that each of the elements of any claim

20   is met by the accused, quote, infringing products.

21             THE COURT:  True.

22             MS. FREEMAN:  That is what we're talking about.

23   We're not suggesting that there's final proof.  This is not

24   a summary judgment motion.  That's way premature.  And we

25   believe that the patent rules are just simply not relevant.

1     This Court is to judge the pleadings based on the

2     Twombly-Iqbal pleading standard.

3             As to InCom, BDC argues that InCom is relevant.

4     InCom is definitely not relevant.  In InCom there was novel

5     and unique functionality that previously had not existed.

6     There's no allegation that there's a novel and unique

7     functionality here that hadn't previously existed.  So InCom

8     is not relevant.  It's not on point.

9             I think unless Your Honor has any questions,

10    that's all I have.

11            THE COURT:  Thank you.

12            MS. FREEMAN:  Thank you, Your Honor.

13            THE COURT:  Would counsel like the last word?  And

14    most lawyers don't turn that down.

15            MR. TAMKIN:  I was going to make a joke about

16    that.

17            THE COURT:  It happens, but it's rare.

18            Thank you for your argument, Counsel.

19            MR. TAMKIN:  It's probably a bad idea to give a

20    lawyer an invitation to the last word, I would agree.  I

21    will be very brief.  I really only want to address, I think,

22    a couple of points.

23            The first one is that there's an argument that,

24    well, really the plaintiff is saying you can just take the

25    claim language and just throw it out there and if you throw

1      it out there, that's enough and that can't be right.

2              Well, first of all, there's a difference between

3      a -- the Supreme Court said you can't set forth formulaic

4      elements of a cause of action.  The formulaic elements of a

5      cause of action are different than the elements of a claim.

6      Elements of a claim -- it happens to be the same word, but

7      the elements of the claim are the parts of the claim.

8      There's five parts, say, of a claim or three parts of a

9      claim or 12 parts of a claim.

10             What the Supreme Court said is you can't set forth

11     the formulaic elements of a cause of action in that regard

12     and by that it means, you know, if -- take a negligence

13     claim.  You can't set forth there's a duty, a breach,

14     proximate cause, and damages.  That's what the Supreme Court

15     is saying.

16             But what we did is set forth certainly there's

17     infringement.  Of course we make that allegation.  I think

18     it's paragraph 20, paragraph 53, and others.  But then

19     there's also the factual allegations that underpin that and

20     that's what we did.

21             Whenever you file a complaint in federal court,

22     and state courts too have similar, you're bound by Rule 11.

23     There's an ethical obligation to set forth a complaint only

24     after a good-faith belief has been identified and the facts

25     set forth therein.  You must have a good-faith belief in

1    those facts.  You're bound by those.

2            Here those facts exist.  Those facts not only are

3    based on the good-faith belief of the signer of the

4    pleading, but they're set forth and they're cited.  We're

5    not simply saying go look at the Internet and that suffices.

6            Somehow the rules are being reversed.  Whereas the

7    plaintiff actually puts forth the definitive support, that

8    definitive support is being turned against the plaintiff.

9    That's not appropriate here.

10           Yes, there's a citation to the definitive support

11   to provide additional notice to the defendant exactly what

12   they're doing that infringes.  At section 22 of a particular

13   invoice the defendant is doing exactly what we say they're

14   not supposed to be doing.  At section 53 of that video

15   something else.  That's just providing additional notice.

16   Nobody is saying, yes, see the Internet, therefore they

17   infringe.  That's not what's going on here.  There are facts

18   that identify how they infringe.

19           The last issue that I wanted to address is with

20   respect to the case law that's cited.  There's -- please

21   read the Windy City case again.  There's nowhere in the

22   Windy City case that it says that this is a unique case and

23   should only be applied in a software context.  The Windy

24   City case is quite clear it applies across the board.  It's

25   been cited a number of times.  It's not a special

1    circumstance type of case.  It simply requires that the

2    complaint -- it finds, based on what is stated in the

3    complaint, the complaint describes the accused

4    instrumentalities and the functionalities of those products

5    which allegedly infringe on the plaintiff's patents and the

6    ways in which they do that.  That's all that is required.

7    That's what was done here.

8         The InCom case is apropos.  It's just like any

9    other case, you describe the novelty or the uniqueness of

10   the invention.  Every patent under Section 101 of the Patent

11   Act requires a patent to be novel and unique.  You can't get

12   a patent if there's not a novelty or uniqueness.  You

13   describe that, and the way that's described is in the

14   claims.  You set forth that those claims exist, that there

15   is factual support for those claims, and that's what you

16   need to do.

17        In the InCom case they set forth in general what

18   the claims laid out and what the invention was.  They

19   described the claims.  They described the invention in the

20   claims and they said this product seems to do those things.

21   It was sort of on information and belief in that case, but

22   it seems to do those things, we've seen it.  The InCom case

23   is relevant too.  You don't need to -- under the InCom case

24   you don't need to go element by element and identify.  We

25   have, in fact, done that, but you don't need to.

1          So for all those reasons the motion should be

2     denied and we should get this case moving.

3          THE COURT:  Well, as I said, I'll deem the matter

4     submitted.  You both describe the complaint quite

5     differently and briefed it, so I will deem that submitted.

6          Why don't we now discuss -- I suppose since you've

7     submitted the -- unless counsel have discussed it and met

8     and conferred differently, I assume I should get the

9     reaction of defense counsel on the preliminary injunction --

10    or maybe the two of you have talked -- about timing.

11         MR. TAMKIN:  There was a request for an extension

12    of time to brief the response.

13         THE COURT:  Right.

14         MR. TAMKIN:  And I think they requested a short

15    extension of a week or two weeks, I'm not sure.  Of course

16    we don't have an objection to, especially this time of year,

17    a short extension of the briefing schedule.

18         THE COURT:  So what's the defense counsel's point

19    of -- maybe both of you can come on up to the podium just so

20    we can make sure that everybody can hear and get it down.  I

21    guess there's a couple of issues, and I'm not going to

22    create one where there isn't one.  So one is the briefing

23    schedule and two is coordination or lack thereof or its

24    relationship, if any, to the motion I've just heard --

25         MR. TAMKIN:  If I --

1      THE COURT:  -- separate from the issue of the

2  mediation issue I'll bring up at the end.

3      MR. TAMKIN:  You know, obviously the first thing

4  that always happens in a case like -- well, often what

5  happens in a case like this there's a motion to dismiss.  If

6  we had filed the preliminary junction motion immediately, we

7  would still have been in the same boat and I presume there

8  would have been a similar motion to dismiss and so we would

9  have had to get that resolved first.  So I think we're

10  getting that resolved first and once we do, we should move

11  forward with the preliminary injunction.

12      THE COURT:  By reading -- and I'm not going to

13  claim I've read it super carefully, but I've got all the

14  briefs on the preliminary injunction, but by reading -- kind

15  of going through the opening brief it's obvious that, not

16  inconsistent with other preliminary injunction requests,

17  especially the way it's been requested, where you've lost

18  one competitor, that sooner rather than later.

19      MR. TAMKIN:  Obviously sooner rather than later is

20  most important to us.  We tried to get this case resolved a

21  couple of times before and after the complaint was filed.

22  We've been unsuccessful.  I know we will talk about that

23  again momentarily.

24      THE COURT:  All right.

25      MR. TAMKIN:  But sooner rather than later is

1    important.  The reality, though, is there's a certain

2    limited number of these that are sold a year, so the sooner

3    the better.  At this point we've had to go through and brief

4    the motion to dismiss and go through that whole process.  We

5    are comfortable around that.  I would like to do this

6    hopefully as soon as possible, but if counsel needs a couple

7    of weeks to respond, we are where we are.

8         MS. FREEMAN:  With regard to the timing of the

9    deadline of our opposition to the motion for preliminary

10   injunction, we have requested an extension.  We do

11   appreciate BDC's courtesy in offering to allow us a one- to

12   two-week extension.  We believe the deadline right now is

13   December 13th.  A one-week extension, if I'm correct, would

14   take us to the 20th.  I don't know if it's a Saturday or a

15   weekend date, but if we could get an extension to

16   December 23rd, that would be great.

17        THE COURT:  I can tell you here in just --

18   somebody else will probably call it up on their phone

19   quicker.  The 23rd is a Saturday.

20        MS. FREEMAN:  Okay.  If we could get an extension

21   to the 22nd.

22        MR. TAMKIN:  Sure.  We have no objection to that.

23        THE COURT:  Okay.  December 22nd.

24        MR. TAMKIN:  Just for our expert purposes, we're

25   going to need an -- that would, I think, put our response --

1     would that put our response on the 29th or the --

2            THE COURT:  Maybe you could go into maybe the end

3     of the first week in January?

4            MR. TAMKIN:  Yes, that would --

5            THE COURT:  I will give you a date right now.

6     That would be -- the first Friday in January, but then we

7     can discuss a different date, would be Friday, January 5th.

8     That means New Year's day is on Monday.  So whether that

9     means you want to go to Monday, January 8th.

10           MR. TAMKIN:  I think just because I'm worried

11    about experts being out and --

12           THE COURT:  And that whole holiday time in there,

13    there's a lot of people out and about.  We could begin with

14    December 22nd and Monday, January 8th, and then if people

15    get back to their offices and say, well, I wish we would

16    have known this because now we may have to get back to the

17    Court because we would have suggested some other time.  So

18    that's what I'll write down here, is the 22nd and the 8th.

19           MR. TAMKIN:  Thank you, Your Honor.

20           THE COURT:  So where does that then -- before we

21    get to the final piece, I'm assuming, of course -- let's

22    just say, for example, and sometimes -- I'm not going to

23    watch the expression on Ms. Converse's face or other

24    chambers people because sometimes they know when we get into

25    trying to expedite things they'll say -- and I have been

1    known to do this, so people kind of knew where they stood,

2    would file rather quickly an up or down decision with the

3    memorandum and opinion to follow.  Sometimes lawyers say,

4    no, we would rather get the whole thing all together, not

5    just motion granted or motion denied.

6         What I will do is after we get some further input

7    here is probably give you -- probably early next week I'll

8    give you a contact with respect to chambers.  I don't think

9    it will be controversial or we'll need a short on- or

10   off-the-record telephone conference, but give you -- I'll

11   give you a date here's when I will decide the case and

12   here's when we'll coordinate the hearing.

13        Because there's another issue depending on the

14   Court's decision, and I'll try to make sure that doesn't

15   complicate either counsel or your clients.  For example, in

16   a Rule 12 setting we get -- the most common result is if a

17   case is granted, it's without prejudice.  Well, then that

18   kind of -- given the situation here, I'll kind of look at

19   how to coordinate all this.  Obviously if the motion is

20   denied, then that doesn't create that issue.  But if it's

21   granted in part, then I'll -- in other words, I'm just going

22   to sit back and take a look at things and I'll suggest a

23   schedule.

24        Probably we'll send out a short e-mail from my

25   courtroom deputy, Brenda Schaffer, to you early next week to

1    say here's how I see the schedule so you kind of know

2    exactly.  Then we could then also coordinate any hearing

3    date with respect to the preliminary injunction.

4              MR. TAMKIN:  That would be great.

5              THE COURT:  So if you know that that's kind of the

6    timeline and worst-case scenario, which I don't think is a

7    worst case -- is such a bad scenario, if I set something up

8    and you get that sometime early to midweek next week and

9    say, whoa, we need to talk to the judge and have a short

10   telephone conference, fine, that's what we'll do and it will

11   be up to counsel whether you want it on or off the record,

12   that's not a problem.

13             So the issue, without trying to put anybody on the

14   spot, the issue of making a magistrate judge available for

15   any discussions because one or more of you in the room are

16   thinking either the time for talk is over, the judge just

17   doesn't know that, he's clueless, and we need to get some

18   decisions from him first or it would be, without anybody

19   compromising your respective positions of your clients, we

20   could make it a calendar priority and sometimes lawyers say,

21   well, we would rather talk sooner than later or we don't

22   need the assistance of the magistrate or we have our own

23   person we're dealing with.

24             What's the -- whether there's consensus, no

25   consensus or -- I can tell you right up-front I know one of

1    the criticisms across the country from some of these

2    seminars I spoke at and not just unique to patents is

3    they'll say, with or without input from the lawyers, the

4    judge just ordered us to mediation and actually then

5    requires us usually to get our own mediator and don't come

6    back, I'm going to make no decisions.  I'm not going to do

7    that.

8            And I'm not -- if you could agree to some early

9    get-together with or without our help either before I make

10   any decisions or after, I mean, I can make that happen, give

11   it priority with one of our magistrates.  It would be

12   ordinarily Judge Rau, but if he can't do it because of his

13   surgery -- because I've talked to both of them just this

14   week about that very issue.

15           Any thoughts?  Maybe you're thinking, well, we

16   need to talk to our clients and one another or we'd

17   rather -- or maybe you are absolutely certain what the next

18   step should be here.

19           MR. TAMKIN:  From our point of view, we've had

20   some -- a significant back and forth and ultimately decided,

21   okay, that didn't go anywhere, we've got to get this case

22   moving.  But because we did have this significant back and

23   forth, that means we're interested in trying to get this

24   resolved.  So we don't have any objection to trying to get

25   it resolved.  I'm not particularly hopeful, but maybe a

1    magistrate could be helpful if the defendant thinks so.

2         MS. FREEMAN:  I would have to confer with

3    TA Instruments.

4         THE COURT:  And that's fair enough because I don't

5    mean to put anybody on the spot.

6         And the other thing is one of your concerns or

7    both of your concerns might be before we adjourn here is

8    what sometimes lawyers are reluctant to say is, well, that's

9    just going to put off everything else.  I can make sure that

10   doesn't happen.  In other words, I would acknowledge we

11   would have an obligation to expedite this and not use this

12   as an excuse, absent stipulation of the parties, to push

13   everything out, whether it's my decision on the motion or

14   preliminary injunction.  No, that would defeat the whole

15   purpose of the whole thing and then it would just create

16   more expense, more delay for everybody and that doesn't

17   benefit anybody.

18        So why don't we do this, then.  People can talk to

19   their respective clients, to one another.  Then the real

20   issue is, well, could we get in in X number of days or weeks

21   because that may make a difference and is it going to delay

22   anything else and so then -- so we can maybe try to make

23   that decision sometime next week as well so we can kind of

24   coordinate the whole thing because it may be you reach an

25   agreement on something or it may be that, well, we need the

1   Court's decision on this before we can do this; or sometimes

2   it's just the reverse, as long as we can get in quicker and

3   sooner rather than later, maybe we can save some time and

4   expense and delay.

5          But I'll let -- I'm not going to order it.  We'll

6   make it happen.  I just don't think it's fair to -- my job

7   is to manage the case, not to micromanage the lawyers and

8   tell you how to represent your clients.  I know that that's

9   going on in various parts around the country.  I don't think

10  any of my colleagues are doing that here either.

11         So we'll just -- I'll send out a timeline next

12  week and then I'll probably just check in and then if

13  there's some agreement on what the communication should be

14  to the Court, you know, you wouldn't have to docket a

15  letter, you could just send in a letter to the Court's

16  chamber box and say, well, we've discussed it and here's

17  where we're at with that issue, if that works for everyone.

18         MR. TAMKIN:  That's fine.  We can --

19         THE COURT:  Or if you say, well, we're at a point

20  we need some more information from the Court, can we have a

21  short conference call next week, that would be fine too.

22         MR. TAMKIN:  I think we can talk to our respective

23  clients hopefully by then and then have some -- and probably

24  talk to each other and then report back to the Court.

25         THE COURT:  In that context, anything further at

1    this time by plaintiff's counsel?

2              MR. TAMKIN:  No, Your Honor.  Thank you for your

3    time.

4              THE COURT:  For defense?

5              MS. FREEMAN:  No, Your Honor.

6              THE COURT:  Other than I've kind of taken part of

7    your lunch break and the court reporter and everybody else

8    in the courtroom.

9              So, Lori, I think you are with me at 1:30 too,

10   aren't you?

11             COURT REPORTER:  Yes, I am.

12             THE COURT:  Well, we will stand in recess.  Thank

13   you for your arguments and thanks, everybody, for coming in

14   and have a good weekend, everyone.

15             MR. TAMKIN:  Thank you too, Your Honor.

16             MS. FREEMAN:  Thank you, Your Honor.

17             THE COURT:  We are in recess.

18        (Court adjourned at 12:34 p.m.)

19                        *     *     *

20

21

22

23

24

25

1

2

3          I, Lori A. Simpson, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7                    Certified by:   *s/ Lori A. Simpson*

8                              Lori A. Simpson, RMR-CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25